IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARLENE OSBORNE, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Civ. No. 16-704-GMS |
| | ) |
| UNIVERSITY OF DELAWARE | ) |
| LIBRARY ADMINISTRATIVE, | ) |
| | ) |
| *Defendant.* | ) |

## **MEMORANDUM**

### I. INTRODUCTION

Plaintiff Marlene Osborne ("Osborne") filed this action against her employer, University of Delaware (the "University"), alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*[1] (D.I. 1, D.I. 12-1, Ex. A). Although the parties have not yet engaged in formal discovery, the University has moved for summary judgment pursuant to Fed. R. Civ. P. 56. (D.I. 11). The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). For the reasons stated below, the University's motion is denied.

### II. BACKGROUND

Osborne, an African-American female, is a long-time employee of the University's Morris Library (the "Library"). (D.I. 14 at 1). From 1996 to 1999, Osborne worked as an administrative assistant in the Library's Administrative Services group. (*Id.* at 2). She sat in the Library's

---

[1] Osborne initiated this action *pro se*, but has since retained counsel.

1

Reception Area, greeted visitors, answered phones, took messages, and performed other "menial tasks." (*Id.*). In 1999, the University moved Osborne to the Office of Vice Provost, where she reported to the Assistant Director of Library Collections, Craig Wilson ("Wilson"). (*Id.*). Osborne considered her job duties in the Office of Vice Provost to be "more complex and sophisticated" than her job duties in the Reception Area. (D.I. 14-1, Ex. 1 ¶ 5). In addition to general secretarial duties, Osborne was responsible for gift-processing, ordering supplies and furniture, reconciling payments with monthly credit card statements, typing acknowledgment letters to donors, maintaining the donor-file, maintaining payroll for student assistants, and serving as the Library representative to the University's Salaried Staff Advisory Council. (*Id.*; D.I. 14-1, Ex. 2). From 1999 to 2011, Osborne consistently received high performance ratings. (D.I. 14 at 2).

After Wilson retired in 2012, another Assistant Director, Dina Giambi ("Giambi"), assumed his responsibilities. (*Id.* at 3). So, Osborne began supporting Giambi. (*Id.*). Osborne and Giambi had worked for years in the same area, allowing Osborne to observe how Giambi supervised, managed, and generally interacted with four other administrative assistants (Anne Esdale, Angela Stringham, Joan Stock, and Sandra Lonie), all of whom are white females. (*Id.*). Osborne alleges that Giambi treated her differently than these other administrative assistants. (D.I. 12-1, Ex. A). Giambi would address Osborne in a disrespectful and loud tone of voice, pound on her desk, criticize her work unfairly, and refuse to answer her questions. (*Id.*).

On September 13, 2013, Library Human Resources officials Julie Brewer ("Brewer") and Paul Anderson ("Anderson") told Osborne that she would be "transferring" back to the Reception Area and provided her a written job description for that position.[2] (D.I. 14-1, Ex. 1 at ¶ 9; *Id.* at

---

[2] The University did not dispute Osborne's assertion that the meeting took place on September 13, 2013. (*See* D.I. 16).

2

Ex. 3). Typically, a University job description has a field that identifies the "incumbent," or person currently holding the office. (*See Id.* at Exs. 3 & 4). For open positions, the job description typically identifies the incumbent as "vacant." (*See Id.* at Ex. 4). According to Osborne, another administrative assistant, Ladonna Miller ("Miller"), currently occupied the position to which she was being transferred. (D.I. 14-1, Ex. 1 at ¶ 9). Nevertheless, the job description Osborne was given identified her as the incumbent, and Brewer told her "this is going to be your position" (or similar language). (*Id.*; D.I. 14-1, Ex. 3). Accordingly, the transfer does not appear to have been voluntary.

There were no changes to Osborne's title (Administrative Assistant II) or compensation as a result of the transfer. (D.I. 16 at 2). But there were changes to the location of her work station, her reporting structure, and her job responsibilities did. Osborne was physically moved from a work station in the Office of Vice Provost to a work station in the Reception Area. (D.I. 12-1, Ex. C). In her new position, Osborne no longer reported to an Assistant Director. Instead, she reported to an Administrative Assistant IV, who in turn reported to an Assistant Director. (D.I. 14-1, Ex. 1 ¶ 20; D.I. 16-1). Finally, Osborne's job duties became the same job duties she performed when she previously worked in the Reception Area from 1996 to 1999. (D.I. 14-1, Ex. 1 at ¶ 9). Osborne was also given administrative duties typically performed by an Administrative Assistant I, such as drafting simple memoranda and answering the phones. (*Id.* at ¶ 14). Osborne considered the move to be a defacto demotion. (*Id.* at ¶ 9).

The University claims that Osborne's move was part of a Library reorganization. (D.I. 12 at 9). During the meeting on September 13, 2013, neither Brewer nor Anderson mentioned anything to Osborne about "reorganizing the Library." (D.I. 14-1, Ex. 1 at ¶ 11). The University has submitted a document dated five days after the meeting with Osborne, September 18, 2013,

3

that discusses a "preliminary" and "conceptual" reorganization plan. (D.I. 12-1, Ex. D). The document itself does not indicate who authored it, who received it, the purposes for which it was created, or how it was actually used. (*Id.*). The University, likewise, has made no assertions as to any of these facts. (*Id.*). The document itself states that "[a]ll staff will learn about the reorganization plan ... in individual meetings today and tomorrow," which would have been September 19th and 20th. (*Id.*). The document asks for "assistance in planning the details," so that the reorganization can be implemented November 1st. (*Id.*). Osborne asserts that she did not have any meetings with anyone on September 19th or 20th regarding the reorganization. (D.I. 14-1 Ex. 1 at ¶ 12).

On October 14, 2013, Brewer emailed the Library administrative team regarding implementation of the reorganization plan. (D.I. 12-1, Ex. C). The email identifies four broad goals: (1) "[e]nsure quality service coverage...," (2) "[e]nable greater unit flexibility...through substantial cross-training across multiple positions," (3) "[c]onsolidate support...," and (4) "[d]evelop equitable distribution of work ... that will also provide opportunities for job enrichment." (*Id.*). The email does not mention, however, any changes to any particular employee's reporting structure or job responsibilities. Thus, the email does not indicate how the "reorganization" relates to or promotes the identified goals. Instead, the bulk of the email describes in detail a process whereby the four employees identified as "Senior Secretary (L6)"—which was a group comprised of Osborne, Miller, Vicky White ("White"), and Linda Garber ("Garber")—would move to different work stations.[3] (*Id.*; D.I. 16-1). Over the course of two-and-a-half

---

[3] It is unclear from the record why the University appears to have two parallel title systems, one employing the term "Administrative Assistant" with the number I, II, or IV appended to the end, and another employing several derivatives of the title "secretary" with the number L5, L6, or L8 appended to the end. Thus, Osborne has two titles: Administrative Assistant II and Senior Secretary (L6).

4

months, the four affected employees would each move several times to various work stations, until coming to rest at their final spot. There is no explanation for why the moves were implemented in this manner, instead of all at once. In the end, Miller, White, and Garber, all of whom are white, were moved from the Reception Area to the Office of Vice Provost, while Osborne was moved from the Office of Vice Provost to the Reception Area. (D.I. 14-1, Ex. 1 at ¶¶ 14-19). Osborne now sat next to Carmen Smith, a Secretary (L5), and the only other African-American administrative assistant in the Library Administrative Services group. (*Id.* at ¶ 21). Accordingly, the African-American administrative assistants in the Reception Area are separated from the white administrative assistants in the Office of the Vice Provost. (D.I. 14-1, Ex. 1 at ¶¶ 18, 21).

Before the reorganization, the three other affected employees (White, Garber, and Miller) never had any experience supporting Librarians, unlike Osborne, who supported Librarians from 1999 to 2013. (*Id.* at ¶ 19). In addition, Osborne started working for the Library Services group before the three other employees. White began working in the Reception Area as an administrative assistant in 2007. (*Id.* at ¶ 15). She took Osborne's former workstation in the Office of Vice Provost and was later promoted, in 2017, to a professional, non-exempt administrative position. (*Id.*). Garber began working in the Reception Area on a part-time basis in 2011 and was later promoted, in 2017, to an Administrative Assistant IV. (*Id.* at ¶ 18). Miller began working in the Reception Area in 1999. (*Id.* at ¶ 14). As part of the reorganization, Miller was given Osborne's former job responsibilities in the Office of Vice Provost. (D.I. 12-1, Ex. A (stating that "Miller was given my former job duties"). Miller was also given a position formerly held by Darlene Moore ("Moore"), an Administrative Assistant II that retired in July 2012. (D.I. 12 at 3-4).

Moore's position was partially-funded from a grant that required the University to replace her with someone who had been specifically trained to perform the services specified under the

grant. (*Id.*). Osborne did not have that training, but Miller did. (*Id.*). Miller had the training, because sometime before Moore retired, the University selected Miller to receive the training from Moore. (*Id.*). It is not clear from the record how Miller was selected to receive this training or whether the opportunity to be selected for the training was open to anyone other than Miller. Osborne's EEOC charge, which serves as the complaint in this case, suggests that the selection process was not open or transparent. Osborne alleges that she was "never even considered for the position," even though she had experience supporting Librarians and more seniority. (D.I. 12-1, Ex. A).

Finally, Brewer's October 14th email described cross-training and opportunities for job enrichment. (*Id.* at Ex. C). Osborne asserts that, after the reorganization, she never underwent any cross-training, nor was she offered this training or aware of any others engaging in this training. (D.I. 14-1, Ex. 1 at ¶ 22). In addition, Osborne asserts that she has not received any meaningful opportunities for job enrichment since the Library Reorganization unlike the other Senior Secretaries (L6) that have since been promoted. (*Id.* at ¶ 23).

### III. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), "[t]he court will grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute is one that 'may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). A material fact is one "that might affect the outcome of the suit under the governing law." *Id.* The court reviews the record in the light most favorable to the nonmoving party and draws all reasonable inferences in her favor. *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011). The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an

essential element of her case for which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Osborne alleges that the University unlawfully discriminated against her by: (i) failing to promote her to the administrative assistant position in the Office of Vice Provost formerly held by Moore, and (ii) demoting her to an administrative assistant position in the Reception Area.[4] (D.I. 12-1, Ex. A). A plaintiff may prove discrimination with direct evidence, as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), or with indirect evidence through the burden-shifting framework, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Tolliver v. Trinity Parish Found.*, 2017 WL 3288119, at *7 (D. Del. Aug. 2, 2017). Here, Osborne relies on the *McDonnell Douglas* burden-shifting framework. (D.I. 14 at 9). Under that framework, Osborne must first establish a prima facie case of discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If a plaintiff succeeds in establishing her prima facie case, then the burden shifts to the defendant employer to proffer a "legitimate non-discriminatory" reason for its actions. *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 497 n.11 (3d Cir. 1999). If the employer meets this burden, then the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's reason is pretextual. *Id.* The court will now apply that framework to the facts of this case.

### A. Prima Facie Case

To establish a prima facie case, Osborne must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and

---

[4] In briefing, Osborne conceded her hostile work environment claim and retaliation claim, leaving only her discrimination claim at issue. (D.I. 14 at 1).

7

(4) the action occurred under circumstances that give rise to an inference of unlawful discrimination. *Makky*, 541 F.3d at 214. The University argues that: (i) Osborne did not suffer an adverse employment action, (ii) even if she did suffer an adverse employment action, she was not qualified for the position, and (iii) and even if she was qualified for the position, she cannot show that the adverse employment action gives rise to an inference of unlawful discrimination. (*See* D.I. 12 at 8-9). Thus, the University challenges every element of a prima facie case except the first: Osborne is a member of a protected class. While considering each of the University's arguments, the court is cognizant of the Third Circuit's guiding principle that "there is a low bar for establishing a prima facie case of employment discrimination." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). The court will address the University's arguments in turn.

"Termination, failure to promote, and failure to hire all constitute adverse employment actions." *Barnes v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015). "Similarly, actions that reduce opportunities for promotion or professional growth can constitute adverse employment actions." *Id.* "[R]eassignment with significantly different responsibilities, or a decision causing a significant change in benefits" can also constitute adverse employment actions. *Tucker v. Merck & Co., Inc.*, 131 F. App'x 852, 855 (3d Cir. 2005) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998)). But "lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions." *Barnes*, 598 F. App'x at 90.

The University emphasizes the fact that Osborne's title (Administrative Assistant II) and compensation did not change after she was reassigned to the Reception Area, suggesting that the reassignment was a lateral transfer. But Osborne contends that the reassignment was a

8

"demotion," and supports her contention by pointing to the fact that she now reports to someone lower in the organizational chart, has less sophisticated responsibilities, and sometimes performs duties typically reserved for an Administrative Assistant I. In addition, Osborne has pointed to evidence tending to show that she experienced reduced opportunities for promotion when she was not given the opportunity to be considered for selection to receive the training for Moore's position. Accordingly, Osborne has sufficiently established disputes of material fact as to whether she experienced adverse employment actions with respect to her reassignment and the failure to be considered for a promotion.

Osborne contends that she received consistently high performance ratings from 1999 to 2011. (D.I. 14 at 2). As the University admits, Osborne's performance review around the time of the reorganization was "generally positive" and contained "numerous positive comments." (D.I. 12 at 5-6). Any negative comments in the review were "fairly muted." (*Id.*). The University claims that Osborne was not qualified to fill Moore's former position, because she lacked the necessary training. But the Third Circuit has recognized that, "when an employer discriminatorily denies training and support, the employer may not then disfavor the plaintiff because her performance is affected by the lack of opportunity." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 540 (3rd. Cir. 1992). Accordingly, Osborne has established that she was qualified for her former position (since filled by Miller) and she has established a dispute of material fact as to whether she was qualified for Moore's former position.

Finally, "any time a person outside the protected class is promoted over a qualified member of the protected class, they have satisfied the fourth element in establishing a prima facie case." *Kimble v. Morgan Prop.*, 241 F. App'x 895, 898 (3d Cir. 2007); *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007) ("While this Court no longer requires a
9

plaintiff to show that he was replaced by someone outside of the protected class to establish an inference of discrimination, we find that this evidence establishes the fourth and final element of a prima facie case in this case." (citation omitted)). Osborne contends that Miller, a white female, was given Osborne's former job responsibilities in the Office of Vice Provost. (D.I. 12-1, Ex. A). In addition, Miller, who is outside the protected class, was given training which led to a promotion while Osborne was not even given the opportunity to apply for the training. Under Third Circuit precedent, this is sufficient to satisfy the fourth element of a prima facie case. *Kimble v*, 241 F. App'x at 898. Accordingly, the University has not shown that Osborne cannot establish a prima facie case.

**B. Pretext**

Assuming the Library reorganization is a legitimate, non-discriminatory reason for the adverse-employment actions Osborne experienced, then the burden shifts back to Osborne to demonstrate, by a preponderance of the evidence, that the University's reason is pretextual. *Schurr*, 196 F.3d at 497 n.11. "At summary judgment, the plaintiff bears the burden of production but not persuasion." *Andes v. New Jersey City Univ.*, 419 F. App'x 230, 233 (3d Cir. 2011). "In other words, at this stage, the 'real' reason for the employer's action is unimportant; it matters only that there is evidence to suggest that there is a 'real' reason which is not the articulated reason." *Id.* To do this, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act" with legitimate, non-discriminatory motivations. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Osborne has pointed to sufficient implausibilities and inconsistencies regarding the reorganization to meet the burden of production on summary judgment. As noted above, when Brewer and Anderson told Osborne she was being transferred they did nothing to indicate that it was part of reorganization plan. (D.I. 14-1, Ex. 1 at ¶ 11). The first document evidencing a reorganization plan was dated five days after Brewer and Anderson's meeting with Osborne and states that the plan was still "preliminary" and "conceptual." (D.I. 12-1, Ex. D). Accordingly, the only definitive plan at that time was that Miller was the "incumbent" for a position in the Reception Area. (D.I. 14-1, Ex. 3). The University's only two documents regarding the reorganization (the September 18th document and Brewer's October 14th email) indicate that the reorganization plan involved nothing more than physically relocating the Senior Secretaries (L6) so that the white Senior Secretaries (L6) were moved into the Office of Vice Provost with the Librarians and the African-American Senior Secretary (L6) was moved out to the Reception Area. Finally, after the reorganization, Osborne did not receive any cross-training, a stated goal of the reorganization. She also did not experience the same "opportunities for job enrichment"—another stated goal of the reorganization—as the other Senior Secretaries (L6) who have since been promoted. Accordingly, a reasonable factfinder could rationally find that the University's reasons were pretextual.

## V. CONCLUSION

For the foregoing reasons, the University's motion for summary judgment is denied without prejudice to being renewed after the parties have engaged in formal discovery. (D.I. 11). An appropriate order will be entered.

Dated: March 9, 2018

UNITED STATES DISTRICT JUDGE

11